TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

ERIKA M. WELLS
Senior Counsel
Environmental Enforcement Section, ENRD
U.S. Department of Justice
7600 Sand Point Way NE, c/o NOAA/DARC
Seattle, Washington 98115
(202) 532-3258
Erika.wells@usdoj.gov

# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) Case No. CV-24-43 |
| v. | ) |
| | ) COMPLAINT |
| POTLATCHDELTIC LAND & LUMBER, LLC, | ) |
| Defendant. | ) |

- 1 -

Plaintiff United States of America, by authority of the Attorney General, on behalf of the United States Environmental Protection Agency ("EPA"), alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action brought pursuant to Section 309 of the Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1319, against Defendant PotlatchDeltic Land & Lumber, LLC ("Defendant"). The United States seeks civil penalties against Defendant for violations of Section 301 of the CWA, 33 U.S.C. § 1311, and the conditions and limitations of the now-expired 2015 Multi-Sector General Permit ("2015 General Permit") and 1996 Individual Permit ("1996 Individual Permit") issued to Defendant by the EPA under Section 402(a) of the CWA, 33 U.S.C. § 1342(a). These violations occurred at Defendant's St. Maries Complex sawmill and lumberyard facility at 2200 Railroad Avenue ("Facility") in St. Maries, Idaho, within the boundaries of the Coeur d'Alene Tribe's reservation.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to Section 309(b) of the CWA, 33 U.S.C. §§ 1319(b), and under 28 U.S.C. §§ 1331, 1345, and 1355.

3.      Venue is proper in this judicial district pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant is located and is doing business in this judicial district and the events giving rise to the claims alleged occurred within this district.

## DEFENDANT

4.      Defendant PotlatchDeltic Land & Lumber, LLC, a subsidiary of PotlatchDeltic Corporation, was formed in Delaware and does business in Idaho.

- 2 -

5.      At all relevant times, Defendant has owned and operated the Facility, which encompasses approximately 160 acres and includes a lumber mill, plywood plant, power plant, wet and dry log storage yards, and a woody debris storage area.

6.      At all relevant times, Defendant maintained full control over the operational decisions at the Facility, including, but not limited to, the duty to comply with the 2015 General Permit and the 1996 Individual Permit, and the discharges of pollutants from the Facility.

## STATUTORY BACKGROUND

### CLEAN WATER ACT PROHIBITION OF DISCHARGES OF POLLUTANTS

7.      The CWA is designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

8.      To accomplish this goal, Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person except as authorized by, and in compliance with, among other things, the terms and conditions of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

9.      Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

10.      Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include a wide variety of substances, including chemical and industrial waste.

11.      Section 502(5) of the CWA, 33 U.S.C. § 1362(5), defines "person" to include a corporation, partnership, or association.

- 3 -

12.     Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States."

13.     "Waters of the United States" has been further defined to include, among other things, "waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce," and tributaries of those waters. 88 Fed. Reg 61964 (Sept. 8, 2023).

14.     Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" to mean "any discernible, confined and discrete conveyance, including but not limited to any pipe [or] conduit . . . from which pollutants are or may be discharged."

<u>INDUSTRIAL STORMWATER GENERAL PERMIT</u>

15.     EPA may issue a NPDES permit that authorizes the discharge of pollutants to waters of the United States, upon the condition that such discharge will meet all applicable requirements of the Clean Water Act and such other conditions as the permitting authority determines necessary to carry out the provisions of the CWA. 33 U.S.C. § 1342(a).

16.     Any "storm water discharge associated with industrial activity" must be authorized by a NPDES permit. 33 U.S.C. § 1342(p)(2)(B); 40 C.F.R. § 122.26. EPA has defined the term "storm water discharge associated with industrial activity" to include "discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant." 40 C.F.R. § 122.26(b)(14).

- 4 -

17.     Facilities within the categories set out in 40 C.F.R. § 122.26(b)(14), including those in Standard Industrial Classification ("SIC") code 2421 (sawmills and planing mills), are designated as industrial activities that must obtain stormwater permit authorization.

18.     Pursuant to 40 C.F.R. § 122.26(c)(1), dischargers of stormwater associated with industrial activity are required to apply for an individual permit or seek coverage under a general permit.

19.     EPA's 1990 stormwater regulations established the NPDES permit requirements for industrial stormwater discharges, and EPA issued its first Multi-Sector General Permit for those facilities in 1995. The Multi-Sector General Permit applies where EPA is the permitting authority, i.e., to discharges of industrial stormwater that are not covered by stormwater permits issued by delegated authorities such as states or tribes. Since 1995, EPA has issued new versions of the Multi-Sector General Permit. On June 4, 2015, EPA promulgated the 2015 Multi-Sector General Permit. On June 4, 2020, the 2015 General Permit expired and facilities that had coverage were administratively extended until a new permit was issued on September 29, 2021 ("2021 General Permit"). Existing General Permit facilities were to have submitted a notice of intent to be covered by the 2021 General Permit no later than May 30, 2021.

20.     The 2015 General Permit conditions require a facility conducting industrial activities that discharges stormwater to a surface water body or to a storm sewer system that drains to a surface water body to, among other things: develop and implement a Stormwater Pollution Prevention Plan ("SWPPP") for the permitted facility, which includes site-specific measures and best management practices for controlling stormwater pollution; select, install, and document control measures; conduct and document inspections, monitoring, and assessments;

take immediate and subsequent corrective actions within specified deadlines when any conditions specified in Parts 4.1 and 4.2 of the General Permit occur, including when the average of four quarterly sampling results exceed an applicable benchmark; and meet reporting and recordkeeping requirements.

21.     Pursuant to 40 C.F.R. § 122.41(a), and the 2015 General Permit, any permit noncompliance constitutes a violation of the CWA and is grounds for an enforcement action.

22.     Pursuant to 40 C.F.R. § 122.28(b)(3)(i), EPA may require any discharger authorized by a general permit to apply for an individual permit. Cases where EPA may require an individual permit include when the discharger is a significant contributor of pollutants or the discharger is not in compliance with the conditions of the general permit.

<u>REMEDIES FOR CWA VIOLATIONS</u>

23.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes the EPA Administrator to commence a civil action for appropriate relief, including a permanent or temporary injunction, against any person who violates Section 301(a) of the CWA, 33 U.S.C. § 1311(a), or any condition or limitation contained in a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

24.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), subjects any person who violates Section 301 of the CWA, 33 U.S.C. § 1311, or any condition or limitation contained in a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, to a civil penalty not to exceed $25,000 per day for each violation. The Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, and 40

C.F.R. § 19.4 adjusts statutory penalties to account for inflation and other factors. Pursuant to these laws, the current daily statutory maximum penalty is $59,973 for each violation occurring after November 2, 2015.

## GENERAL ALLEGATIONS

25.     Defendant obtained coverage for discharges of non-process wastewater that is comingled with stormwater before discharge from Outfall 001 at the Facility under an individual NPDES permit, No. ID0000019, which became effective on October 31, 1996, and expired on October 31, 2001. EPA administratively continued the 1996 Individual Permit until a new individual permit for Outfall 001 was issued and became effective, which occurred on September 1, 2022 ("2022 Individual Permit").

26.     Since at least 2008 through May 30, 2021, Defendant has had coverage for its four outfalls that discharge stormwater (Outfalls 001, 002, 003, and 004) under the Multi-Sector General Permit.

27.     Defendant had coverage for its stormwater outfalls under the 2008 version of the General Permit ("2008 General Permit") and submitted a Notice of Intent to renew coverage under the 2015 General Permit to EPA on February 29, 2016. The United States Fish and Wildlife Service put a hold on the Notice of Intent on March 15, 2016 due to concerns that the Facility's continued benchmark exceedances for total zinc from the Facility's stormwater discharges to the St. Joe River could adversely affect bull trout.

28.     Bull trout are listed as threatened under the Endangered Species Act and the St. Joe River is designated as critical bull trout habitat under that act. 16 U.S.C.§ 1533.

- 7 -

29.    In response to this hold, EPA administratively extended Defendant's coverage under the 2008 General Permit and requested that Defendant develop a plan to reduce pollutants and meet benchmark values for the Facility's discharges. In March 2017, EPA lifted the hold, and based its determination of Defendant's eligibility for the 2015 General Permit on Defendant's January 4, 2017 Revised Best Management Practices plan ("2017 BMP Plan").

30.    The 2015 General Permit authorized discharges of industrial stormwater from Outfalls 001, 002, 003, and 004 at the Facility, subject to the conditions of the permit. In accordance with Part 2.3 of the 2015 General Permit, Defendant was required to comply with the additional measures in the 2017 BMP Plan.

31.    Outfall 001 discharges directly to the St. Joe River, which at that point constitute Tribal waters of the Coeur d'Alene Tribe. The St. Joe River borders the Facility to the north and west. Stormwater at the northern end of the Facility, which includes the sawmill, plywood mill, and log storage yards, flows via ditches to a stormwater treatment pond and pump house, which pumps the effluent to Outfall 001. Discharges from Outfall 001 reach the St. Joe River through a pipe from the pump house that connects to the River via a short ditch.

32.    Outfalls 002, 003, and 004 discharge stormwater that flows south and east at the Facility to an unnamed ditch at the south end of the Facility, which is part of the Mutch Creek watershed and is a tributary to the St. Joe River, connected via a pump station which pumps water from Mutch Creek and the ditch over a levee to the River.

33.    Stormwater pollutants associated with the industrial activities at the Facility include diesel, fuel, hydraulic oil, bark and woody debris, phenolic resin and caustics, antifreeze, suspended sediment, zinc, and chemical oxygen demand ("COD"). The industrial activities at the

Facility include use of a sprinkler system for wetting of logs in the log storage yard. The Facility reuses stormwater for its log sprinkler system for several months of the year.

34.     The St. Joe River, the unnamed ditch at the south end of the Facility that is a tributary to the St. Joe River, and Mutch Creek are waters of the United States within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

35.     Defendant is a "person" as defined in Section 502(5) of the CWA, 33 U.S.C. § 1362(5), and 40 C.F.R. §§ 112.2 and 122.2.

36.     The four stormwater outfalls at the Facility, including the short ditch that conveys discharges from the Outfall 001 pipe to the River, and the pump station that pumps water from Mutch Creek and the ditch over the levee to the River are each "point source[s]" within the meaning of CWA Section 502(14), 33 U.S.C. § 1362(14).

37.     On March 9, 2017, EPA conducted a CWA inspection of the Facility. During the 2017 inspection, EPA identified numerous violations of the conditions of the 2015 General Permit, including failures to implement timely corrective actions following continued benchmark exceedances at all four outfalls and to satisfy other conditions of the permit.

38.     From March 2017 to May 2021, Defendant met one or more of the conditions listed in Parts 4.1 and 4.2 of the 2015 General Permit that require corrective actions. Defendant exceeded the average of four quarterly sampling results at Outfalls 001, 002, 003, and 004 for one or more of the following benchmark parameters: total suspended solids ("TSS"), COD, and total zinc (freshwater, hardness dependent). Defendant also failed to take immediate (same day) and subsequent corrective actions (within 14 calendar days from the time of discovery, but not longer than 45 days). Defendant further failed to notify EPA of its' intention to exceed the 45

day timeframe, including providing a rationale for an extension and a completion date for a corrective action.

39.     On February 17, 2021, EPA notified Defendant that pursuant to 40 C.F.R. § 122.28(b)(3)(i), it was required to apply for an individual NPDES permit for the Facility for the four stormwater outfalls that were then covered by the Facility's 2015 General Permit.

40.     Defendant applied for an individual permit, as required by EPA, by May 13, 2021. It did not, however, apply for coverage under the 2021 General Permit.

41.     On June 7, 2021, EPA conducted another CWA inspection of the Facility and noted Defendant's continued benchmark exceedances for TSS, COD, and/or total zinc at Outfalls 001, 003, and 004 and associated failure to identify and document additional corrective actions. The inspection also noted that the Facility no longer had coverage under the 2015 General Permit after May 31, 2021.

42.     Pursuant to Section 301(a) of the CWA, 33 U.S.C. § 1311(a), which prohibits discharge of a pollutant from a point source to a water of the United States except as permitted under the NPDES, while the Facility had applied for an individual permit, the Facility needed to maintain coverage under the General Permit until the individual permit was final and effective.

43.     EPA reissued Individual NPDES Permit, No. ID0000019, effective September 1, 2022, and expiring August 31, 2027, and included coverage for the four stormwater Outfalls 001-004, pursuant to 40 C.F.R. § 122.28(b)(3)(i). The 2022 Individual Permit requires, *inter alia*, monitoring and reporting, and a compliance schedule for the Facility to meet interim and final effluent limitations for specified pollutants.

## FIRST CLAIM FOR RELIEF

### (Failure to Maintain Eligibility Compliance under the 2015 General Permit)

44.     Plaintiff realleges paragraphs 1 through 43.

45.     The 2015 General Permit Parts 1.1.4.5 and 2.3 required Defendant to comply with its 2017 BMP Plan in order to maintain eligibility for coverage under the permit. The 2017 BMP Plan provided a schedule for construction of improvements at Outfall 001 in 2017 and at Outfalls 002, 003, and 004 in 2018. The 2017 BMP Plan further provided that the Facility would "[a]djust and refine 2017 improvements and take corrective actions as indicated by 2017 post-construction sampling results" during the 2018 construction season, and "[e]valuate the impacts of installed improvements to determine whether additional controls are necessary" based on 2018 and 2019 post-construction season sampling.

46.     Defendant failed to timely implement measures required by the 2017 BMP plan in accordance with the schedule set forth in the plan, and to evaluate and implement subsequent measures when discharges from outfalls continued to exceed benchmark parameters.

47.     The 2017 BMP Plan identified a design date for control measures for Outfall 004 by May 31, 2018, with the improvements to be constructed in the 2018 construction season. Defendant did not complete the measures at Outfall 004 until the second quarter of 2020. After implementation of the measures, this outfall continued to exceed the annual four quarter average for one or more benchmark parameters, and Defendant failed to identify and implement subsequent corrective actions as required by the 2015 General Permit and 2017 BMP Plan.

48.     Measures identified in the 2017 BMP plan for Outfall 001 were timely installed in the third quarter of 2017. However, after implementing these measures, Defendant continued to

- 11 -

exceed the annual four quarter average for one or more benchmark parameters at this outfall, and

Defendant failed to identify and implement subsequent corrective actions as required by the 2015

General Permit and 2017 BMP Plan.

49.    Measures identified in the 2017 BMP Plan for Outfall 003 were timely installed in

the third quarter of 2018. However, after implementing these measures, Defendant continued to

exceed the annual four quarter average for one or more benchmark parameters at this outfall, and

Defendant failed to identify and implement subsequent corrective actions as required by the 2015

General Permit and 2017 BMP Plan.

50.    Each failure identified in Paragraphs 47 through 49 above constitutes a violation

of the 2015 General Permit.

51.    Defendant is liable for civil penalties not to exceed $59,973 per day for each

violation of the 2015 General Permit occurring after November 2, 2015, pursuant to Section

309(d) of the CWA, 33 U.S.C. § 1319(d), the Federal Civil Penalties Inflation Adjustment Act of

1990, as amended by the Debt Collection Improvement Act of 1996, and the Federal Civil

Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, and 40

C.F.R. § 19.4.

## SECOND CLAIM FOR RELIEF

**(Failure to timely modify the SWPPP and/or implement corrective actions following**

**continued benchmark exceedances under the 2015 General Permit)**

52.    Plaintiff realleges paragraphs 1 through 43.

53.    Part 4.2 of the 2015 General Permit specified that "[i]f the average of four

quarterly sampling results exceeds an applicable benchmark" for a single parameter, or "[i]f less

- 12 -

than four benchmark samples have been taken, but the results are such that an exceedance of the four quarter average is mathematically certain (i.e., if the sum of quarterly sample results to date is more than four times the benchmark level)," then the discharger must review its SWPPP to determine if modifications are necessary to meet the effluent limits in the permit.

54.     Pursuant to Part 4.3 (Corrective Actions and Deadlines) of the 2015 General Permit, if corrective action is needed the discharger must "immediately take all reasonable steps necessary to minimize or prevent the discharge of pollutants until a permanent solution is installed and made operational," and if additional actions are necessary, "must complete the corrective actions before the next storm event if possible, and within 14 calendar days from the time of discovery of the corrective action condition," or if not feasible, document why and provide a schedule for completing the work as soon as practicable and within 45 days after discovery. 2015 General Permit, Parts 4.3.1 and 4.3.2.

55.     On at least 11 times between March 2017 and May 2021, Defendant exceeded an applicable benchmark value for a single parameter at an outfall for any three quarters during a calendar year, including benchmark exceedances of zinc, TSS, and COD, or individual sample results were such that an exceedance of the four quarter average was mathematically certain, and failed to timely modify the SWPPP and/or implement corrective action.

56.     In accordance with Part 6.2.1 of the 2015 General Permit, each failure identified in Paragraph 55 above constitutes a violation of the 2015 General Permit.

57.     Defendant is liable for civil penalties not to exceed $59,973 per day for each violation of the 2015 General Permit occurring after November 2, 2015, pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), the Federal Civil Penalties Inflation Adjustment Act of

1990, as amended by the Debt Collection Improvement Act of 1996, and the Federal Civil

Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, and 40

C.F.R. § 19.4.

## THIRD CLAIM FOR RELIEF

### (Failure to comply with Annual Reporting requirements under the 2015 General Permit)

58.     Plaintiff realleges paragraphs 1 through 43.

59.     Defendant's Annual Reports for the years 2017 through 2020 were inadequate

because Defendant failed to include all required information in the Annual Reports, to satisfy the

requirements of Parts 4.4 (Corrective Action Documentation) and 7.5 (Annual Report) of the

2015 General Permit, including but not limited to: status of ongoing corrective actions,

outstanding corrective actions, and/or incidents of noncompliance in the previous year.

60.     Each failure identified in Paragraph 59 above constitutes a violation of the 2015

General Permit.

61.     Defendant is liable for civil penalties not to exceed $59,973 per day for each

violation of the 2015 General Permit occurring after November 2, 2015, pursuant to Section

309(d) of the CWA, 33 U.S.C. § 1319(d), the Federal Civil Penalties Inflation Adjustment Act of

1990, as amended by the Debt Collection Improvement Act of 1996, and the Federal Civil

Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, and 40

C.F.R. § 19.4.

## FOURTH CLAIM FOR RELIEF

### (Failure to notify EPA of anticipated or other noncompliance and subsequent corrective

### actions under the 2015 General Permit)

- 14 -

62.     Plaintiff realleges paragraphs 1 through 43.

63.     Appendix B, Subsection 12.B of the 2015 General Permit required Defendant to give advance notice to EPA of any planned changes in the permitted Facility or activity which may result in noncompliance with the permit requirements.

64.     Part 4.3.2 of the 2015 General Permit required the Facility to notify EPA when the completion of a required corrective action will exceed the 45-day timeframe, including a rationale for extension, and a completion date, which must also be included in the Facility's corrective action documentation (Part 4.4).

65.     The 2017 BMP Plan required: "Potlatch will notify the USEPA if they decide to modify the approach or schedule described herein."

66.     Since the submittal of the 2017 BMP Plan, Defendant modified various project schedules and corrective actions, and failed to notify EPA of changes to the corrective actions and associated schedules, including providing a rationale to justify such changes and completion dates for corrective actions, as required under the 2015 General Permit.

67.     Each failure identified in Paragraph 66 above constitutes a violation of the 2015 General Permit.

68.     Defendant is liable for civil penalties not to exceed $59,973 per day for each violation of the 2015 General Permit occurring after November 2, 2015, pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, and 40 C.F.R. § 19.4.

- 15 -

## FIFTH CLAIM FOR RELIEF

### (Failures to implement an adequate SWPPP)

69.     Plaintiff realleges paragraphs 1 through 43.

70.     Defendant developed a SWPPP on March 1, 2017 and did not revise or update the SWPPP again until at least August 26, 2020, as noted in the updated SWPPP dated September 2, 2020, failing to timely update the SWPPP within 14 days of completing corrective action work as required by Part 4.3.2 of the 2015 General Permit.

71.     As identified during the March 2017 EPA inspection, Defendant failed to provide an adequate SWPPP site map that identifies stormwater flow direction, control measures, outfalls and/or monitoring points associated with the wood debris area of the Facility, as required by Part 5.2.2 of the 2015 General Permit.

72.     The Facility's SWPPP did not list mill structures or buildings as potential sources of pollution, when the 2015 General Permit identifies such structures in areas of industrial activity as potential sources of pollution, as required by Parts 5.2.3, 5.2.3.1, and 5.2.3.2 of the 2015 General Permit.

73.     Starting from completion of stormwater control measures for Outfall 001 in October 2017, Defendant failed to incorporate and document maintenance measures in the SWPPP for the control measures in the 2017 BMP plan, including a schedule or frequency for maintaining all control measures, as required by Parts 2.1.2.3 and 5.2.5.1 of the 2015 General Permit.

74.     As required by Part 5.2.6.1 of the 2015 General Permit, Defendant failed to document measures required by the 2017 BMP plan to maintain its eligibility for coverage under

- 16 -

the permit in its SWPPP, including documenting any changes to corrective actions and the associated schedule in the 2017 BMP plan.

75.     Part 4.1 of the 2015 General Permit required that "you must review and revise, as appropriate, your SWPPP (e.g., sources of pollution; spill and leak procedures; non-stormwater discharges; the selection, design, installation and implementation of your control measures) so that the permit's effluent limits are met and pollutant discharges are minimized. . . whenever a visual assessment shows evidence of stormwater pollution (e.g., foam)."

76.     Section I.A of the 1996 Individual Permit also required that surface waters "be free from floating, suspended, or submerged matter of any kind in concentrations causing nuisance or objectionable conditions . . .."

77.     During the 2017 EPA inspection, EPA observed foam in discharges at Outfall 001, in violation of Section I.A of the 1996 Individual Permit, and Defendant failed to revise its SWPPP to address the foam issues as required by Part 4.1 of the 2015 General Permit.

78.     Each failure identified in Paragraphs 67 through 74 and 77 above constitutes a violation of the 2015 General Permit, and the presence of foam in discharges identified in Paragraph 77 also constitute violations of the 1996 Individual Permit.

79.     Defendant is liable for civil penalties not to exceed $59,973 per day for each violation of the 2015 General Permit and the 1996 Individual Permit occurring after November 2, 2015, pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, and 40 C.F.R. § 19.4.

## SIXTH CLAIM FOR RELIEF

**(Failure to inspect and document control measures under the 2015 General Permit)**

80.     Plaintiff realleges paragraphs 1 through 43.

81.     Part 3.1 (Routine Facility Inspections) of the 2015 General Permit required routine inspections at least quarterly, or more frequently when appropriate, including inspection of all control measures, and Part 3.1.2 (Routine Facility Inspection Documentation) required the results of these inspections to be documented in the SWPPP, as required by Parts 5.2.5.1 (Schedules and Procedures, Pertaining to Control Measures Used to Comply with the Effluent Limits in Part 2) and 5.5 (Additional Documentation Requirements), and in Annual Reports, as required by Part 7.5 (Annual Report).

82.     Defendant's quarterly inspection forms under both the 2017 and 2020 SWPPP did not include entries for inspection of all control measures identified in the 2017 BMP plan.

83.     Since Defendant's completion of control measures at Outfall 001 starting in 2017, Defendant failed to document any inspections or preventative maintenance procedures, including regular inspections, testing maintenance, and repair of control measures, including a schedule and/or frequency for maintenance as required by Parts 3.1, 3.1.2, 5.2.5.1, 5.5, and 7.5 of the 2015 General Permit.

84.     Each failure identified in Paragraph 83 above constitutes a violation of the General Permit.

85.     Defendant is liable for civil penalties not to exceed $59,973 per day for each violation of the 2015 General Permit occurring after November 2, 2015, pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), the Federal Civil Penalties Inflation Adjustment Act of

1990, as amended by the Debt Collection Improvement Act of 1996, and the Federal Civil

Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, and 40

C.F.R. § 19.4.

## SEVENTH CLAIM FOR RELIEF

**(Failure to follow and document appropriate procedures for calculating hardness data under the 2015 General Permit)**

86.     Plaintiff realleges paragraphs 1 through 43.

87.     Part 6.2.1.1 of the 2015 General Permit required: "If your facility is one of the industrial sectors subject to benchmark concentrations that are hardness-dependent, you are required to submit to EPA with your [Notice of Intent ("NOI")] a hardness value, established consistent with the procedure in Appendix J, which is representative of your receiving water."

88.     Appendix J of the 2015 General Permit provided, "Regardless of the method used, you are responsible for documenting the procedures used for determining hardness values. The hardness value is required to be submitted to EPA with your Notice of Intent (NOI) … You must retain all report and monitoring data in accordance with Part 7.5 of the Permit."

89.     During the March 2017 EPA inspection, EPA identified that, based on sampling results, Defendant needed to update the hardness value submitted with its NOI, which affects the calculation of the appropriate benchmark value for zinc.

90.     Defendant failed to timely submit an updated hardness value to EPA, and failed to document in its SWPPP the method(s) selected to determine the appropriate hardness value for the receiving water or any report and monitoring data for the collection and analysis of

freshwater that corresponds to the selection of the hardness value, as required by Part 6.2.1.1, 7.5, and Appendix J of the 2015 General Permit.

91.    Each failure identified in Paragraph 90 above constitutes a violation of the 2015 General Permit.

92.    Defendant is liable for civil penalties not to exceed $59,973 per day for each violation of the 2015 General Permit occurring after November 2, 2015, pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, and 40 C.F.R. § 19.4.

## EIGHTH CLAIM FOR RELIEF

### (Inadequate employee training under the 2015 General Permit)

93.    Plaintiff realleges paragraphs 1 through 43.

94.    Part 2.1.2.8 (employee training) of the 2015 General Permit required that personnel must receive training, if related to the scope of their job duties, on the "location of all controls on the site required by this permit, and how they are to be maintained," and "when and how to conduct inspections, record applicable findings, and take corrective actions."

95.    Defendant's employee training program, as described in the SWPPP, did not provide personnel training on location of all controls (existing and newly installed), maintenance of all controls (existing and newly installed), how to record applicable findings relating to corrective actions and how to take corrective actions, as required by Part 2.1.2.8 of the 2015 General Permit.

96.     The failures identified in Paragraph 95 above constitute violations of the 2015 General Permit.

97.     Defendant is liable for civil penalties not to exceed $59,973 per day for each violation of the 2015 General Permit occurring after November 2, 2015, pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, and 40 C.F.R. § 19.4.

## NINTH CLAIM FOR RELIEF

**(Failure to perform good housekeeping measures in order to minimize pollutants and comply with non-numeric technology-based effluent limits under the General Permit)**

98.     Plaintiffs reallege paragraphs 1 through 43.

99.     Part 2.1.2.2 of the 2015 General Permit required, "You must keep clean all exposed areas that are potential sources of pollutants. You must perform good housekeeping measures in order to minimize pollutant discharges. Including but not limit to, the following: Keep all dumpster lids closed when not in use."

100.    Part 8.4.3.1 of the 2015 General Permit requires that in areas where storage, loading and unloading, and material handling occur, the permittee must perform good housekeeping to minimize the discharge of wood debris, leachate generated from decaying wood materials, and generation of dust.

- 21 -

101.    During the March 2017 EPA Inspection, EPA observed approximately 20 open dumpsters without lids, indicating contents, including wood waste and scrap material, would always be exposed to the elements.

102.    During the March 2017 EPA Inspection, EPA noted that an approximately six-acre woody debris storage area southwest of the Facility was poorly maintained, with observed puddles of stormwater with algal growth associated with leachate runoff from the woody debris storage area.

103.    Each failure to perform good housekeeping measures in order to minimize pollutants and comply with non-numeric technology-based effluent limits identified in Paragraphs 101 and 102 above constitutes a violation of the 2015 General Permit.

104.    Defendant is liable for civil penalties not to exceed $59,973 per day for each violation of the 2015 General Permit occurring after November 2, 2015, pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, and 40 C.F.R. § 19.4.

**TENTH CLAIM FOR RELIEF**

**(Unauthorized discharges of magnesium chloride)**

105.    Plaintiff realleges paragraphs 1 through 43.

106.    Pursuant to Defendant's SWPPP, and as noted by EPA during the 2017 inspection, Defendant applied magnesium chloride to unpaved roads as a dust suppressant during conditions that might generate dust. Defendant applied magnesium chloride on at least four

occasions between May 2017 and May 2019, which had the potential to comingle with stormwater and be discharged from the Facility.

107.    Magnesium Chloride was not a listed allowable non-stormwater discharge in the 2015 General Permit or authorized by Defendant's 1996 Individual Permit.

108.    On at least one occasion Defendant discharged stormwater containing magnesium chloride from the Facility to waters of the United States without an NPDES permit, in violation of Section 301 of the CWA, 33 U.S.C. § 1311. These discharges are not permitted or otherwise authorized by the CWA.

109.    Each day of discharge referred to in paragraph 108 above constitutes a separate violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

110.    Defendant is liable for civil penalties not to exceed $59,973 per day for each violation of Section 301 of the CWA occurring after November 2, 2015, pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, and 40 C.F.R. § 19.4.

## ELEVENTH CLAIM FOR RELIEF

### (Unauthorized discharges of chemical defoamer)

111.    Plaintiff realleges paragraphs 1 through 43.

112.    During the 2017 EPA inspection, Defendant informed EPA that Defendant adds a chemical defoamer to the effluent at Outfall 001 before discharges of stormwater from the outfall, which had been the practice at the Facility for at least five years.

- 23 -

113.     The chemical defoamer was not a listed allowable non-stormwater discharge in the General Permit or authorized by the 1996 Individual Permit.

114.     On at least 44 occasions since March 2017, Defendant discharged stormwater containing a chemical defoamer from the Facility to waters of the United States without an NPDES permit, in violation of Section 301 of the CWA, 33 U.S.C. § 1311. These discharges are not permitted or otherwise authorized by the CWA.

115.     Each day of discharge referred to in paragraph 114 above constitutes a separate violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

116.     Defendant is liable for civil penalties not to exceed $59,973 per day for each violation of Section 301 of the CWA occurring after November 2, 2015, pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, and 40 C.F.R. § 19.4.

**TWELTH CLAIM FOR RELIEF**

**(Unpermitted discharges following expiration of coverage for stormwater outfalls under the 2015 General Permit)**

117.     Plaintiffs reallege paragraphs 1 through 43.

118.     Defendant failed to maintain permit coverage for discharges from its stormwater outfalls between May 30, 2021, the deadline by which Defendant was required and failed to reapply for a new General Permit, and September 1, 2022, when the 2022 Individual Permit became effective.

- 24 -

119.     On approximately 17 occasions between May 31, 2021 and August 31, 2022, Defendant discharged stormwater containing pollutants from the Facility to waters of the United States without an NPDES permit, in violation of Section 301 of the CWA, 33 U.S.C. § 1311. These discharges are not permitted or otherwise authorized by the CWA.

120.     Each day of discharge referred to in paragraph 119 above constitutes a separate violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

121.     Defendant is liable for civil penalties not to exceed $59,973 per day for each violation of Section 301 of the CWA occurring after November 2, 2015, pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, and 40 C.F.R. § 19.4.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully request that this Court order the following relief:

1.     Assess civil penalties against Defendant for up to the maximum amounts provided in the applicable statutes and regulations, pursuant to Sections 309(d) of the CWA, 33 U.S.C. §§ 1319(d);

2.     Impose such injunctive relief on Defendant as may be appropriate to mitigate the effects of Defendant's violations, and prevent any future violations of the same, pursuant to Section 309(b) of the CWA, 33 U.S.C. §§ 1319(b) and the Court's equitable authority;

3.     Award the United States its costs and expenses incurred in this action; and

4.     Grant such other and further relief as the Court may deem just and proper.


Dated: January 24, 2024

- 25 -

UNITED STATES OF AMERICA

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice
Washington, D.C.  20530


/s Erika M. Wells
ERIKA M. WELLS
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice, c/o NOAA
7600 Sand Point Way, NE
Seattle, Washington 98115
(202) 532-3258

OF COUNSEL:

CARA STEINER-RILEY
U.S. Environmental Protection Agency, Region 10

GRACIE PENDELTION
U.S. Environmental Protection Agency, OECA

- 26 -

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 24, 2024 a copy of the foregoing, COMPLAINT, was served by the Court's CM/ECF system upon all persons registered to receive filings in this matter and the below listed counsel:

*Counsel for Defendant*

Kevin Beaton
Stoel Rives LLP
Kevin.beaton@stoel.com
(208) 387-4214


    /s Erika M. Wells

- 27 -